FILED by _____ KS _____ D.C.

Aug 31, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## 21-60253-CR-MOORE/SNOW

Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
42 U.S.C. § 1320a-7b(b)(2)(A)
18 U.S.C. § 1035(a)(2)
18 U.S.C. § 1957(a)
18 U.S.C. § 1343
18 U.S.C. § 2
18 U.S.C. § 982

**UNITED STATES OF AMERICA**

**v.**

**JEREMY WAXMAN,**
**LAWRENCE ALEXANDER,**
**DEAN ZUSMER,**
**RONALD DAVIDOVIC, and**
**UMUT VARDAR,**

   **Defendants.**

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the

Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.     Medicare was subdivided into multiple program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered physician services and outpatient care, including an individual's access to durable medical equipment ("DME"), such as orthotic devices and wheelchairs. Medicare Part C, also known as the "Medicare Advantage" Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations.

3.     Medicare and Medicare Advantage were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

### Part C – Medicare Advantage

4.     Medicare Advantage plans provided beneficiaries with all of the same services provided by an original fee-for-service Medicare plan, in addition to mandatory supplemental benefits and optional supplemental benefits.

5.     To receive Medicare Advantage benefits, a beneficiary was required to enroll in a managed care plan operated by a private company approved by Medicare. Those companies were often referred to as Medicare Advantage plan "sponsors." A beneficiary's enrollment in a Medicare Advantage plan was voluntary.

6.     Rather than reimbursing based on the extent of the services provided, as CMS did for providers enrolled in original fee-for-service Medicare, CMS made fixed, monthly payments to a plan sponsor for each beneficiary enrolled in one of the sponsor's plans, regardless of the services rendered to the beneficiary that month or the cost of covering the beneficiary's health benefits that month.  To receive payment, providers submitted or caused the submission of claims to private health insurance companies electronically via interstate wires, either directly or through a billing company.  The private health insurance companies then reimbursed the provider based on the services that were purportedly provided.

7.     Beneficiaries chose to enroll in a managed care plan administered by private health insurance companies, health maintenance organizations, or preferred provider organizations.  A number of entities were contracted by CMS to provide managed care to Medicare beneficiaries through various approved plans.  Such plans covered DME and related health care benefits, items, and services.  Among its responsibilities, these Medicare Advantage plans received, adjudicated, and paid the claims of authorized providers seeking reimbursements for the cost of DME and related health care benefits, items, or services supplied to beneficiaries.

## Durable Medical Equipment

8.     Orthotic devices were a type of DME that included rigid and semi-rigid devices, such as knee braces, back braces, shoulder braces, ankle braces, and wrist braces (collectively, "braces").

9.     DME suppliers, physicians, and other health care providers that provided services to beneficiaries were referred to as Medicare "providers."  To participate in Medicare, providers were required to submit an application, CMS Form 855S, which contained a certification that stated:

3

I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[,] including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)[.]

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

10.     CMS Form 855S also required applicants to disclose to Medicare any individual or organization with an ownership interest, partnership interest, or managing control of a DME supplier. This included:  (i) all individuals and organizations with five percent or more of an ownership stake, either direct or indirect, in the DME supplier; (ii) all individuals or organizations with a partnership interest in the DME supplier, regardless of the partner's percentage of ownership; (iii) all organizations with "managing control" of the DME supplier; and (iv) all "managing employees."

11.     CMS Form 855S defined an organization with "managing control" of a DME supplier as "[a]ny organization that exercises operational or managerial control" over the DME supplier, or "conducts the day-to-day operations" of the DME supplier. CMS Form 855S defined "managing employee" as "a general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or indirectly conducts the day-to-day operations" of the DME supplier, "either under contract or through some other arrangement, whether or not the individual is a W-2 employee" of the DME supplier.

12.     CMS Form 855S also required the disclosure of "Adverse Legal Actions" against individuals or organizations with an ownership interest, partnership interest, or managing control of a DME supplier. CMS Form 855S defined "Adverse Legal Actions" as, among other things,

any federal or state felony conviction within the previous ten years, and any felony or misdemeanor conviction, under federal or state law, relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance.

13.     If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A health care provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

14.     Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by the Federal Anti-Kickback Statute and other laws and regulations. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

15.     Medicare reimbursed DME suppliers and other health care providers for items and services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare electronically via interstate wires, either directly or through a billing company.

16.     A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the DME provided to the beneficiary, the date the DME was provided, the cost of the DME, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

17.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed medical professional.

**Telemedicine**

18.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

19.     Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers.  Telemedicine companies typically paid doctors a fee to conduct consultations with patients.   In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

20.     Medicare Part B covered expenses for specific telehealth services if certain requirements were met.  These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth service with a remote practitioner.

**Economic Injury Disaster Relief Program**

**The Small Business Administration**

21.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

22.     As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders.  The federal government backed these loans.

## The Economic Injury Disaster Loan Program

23.     The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

24.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization for the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.  In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having.  The advances did not have to be repaid.

25.     In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.  The applicant was further required to "review and check all of the following" statements, which included a statement that the "Applicant is not engaged in any illegal activity (as defined by Federal guidelines)."  If the applicant was "unable to check all of the" certifications, the "Applicant [was] not an Eligible Entity."  The applicant was further required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

26.     EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance.   The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above.  Any funds issued under an EIDL or advance were issued directly by the SBA.  EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

## The Defendants and Related Entities and Individuals

27.     Equilibrium Medical Supply Inc. ("Equilibrium") was a company incorporated under the laws of Florida, with its principal place of business in Broward County, Florida, that maintained bank accounts at City National Bank ending in 5599 ("Equilibrium Account 1") and 7887 ("Equilibrium Account 2").  Equilibrium was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage plan beneficiaries.

28.     Silent Hill Bracing and Orthopedic Supplies, LLC ("Silent Hill") was a limited liability company formed under the laws of Florida, with its principal place of business in Miami-Dade County, Florida, that maintained bank accounts at City National Bank ending in 5586 ("Silent Hill Account 1") and 2183 ("Silent Hill Account 2").  Silent Hill was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage plan beneficiaries.

29.     West Bay Medical Supply, Inc. ("West Bay") was a company incorporated under the laws of Florida, with its principal place of business in Pinellas County, Florida, that maintained an account at JP Morgan Chase ending in 5660 (the "West Bay Account").  West Bay was a DME

supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage plan beneficiaries.

30.     Active Assist DME, Inc. ("Active Assist") was a company incorporated under the laws of Florida, with its principal place of business in Pinellas County, Florida, that maintained a bank account at JP Morgan Chase ending in 5737 (the "Active Assist Account"). Active Assist was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage plan beneficiaries.

31.     SYL Solution Marketing, Inc. ("SYL Marketing") was a company incorporated under the laws of West Virginia. SYL Marketing was a purported marketing company.

32.     LeadCreations.com, LLC ("Lead Creations") was a limited liability company formed under the laws of Florida, with its principal place of business in Broward County, Florida, that maintained an account at JP Morgan Chase ending in 7755 (the "Lead Creations Account").

33.     Telemedicine Company 1 was a limited liability company formed under the laws of Delaware that purported to provide telemedicine services to patients, including Medicare and Medicare Advantage plan beneficiaries.

34.     Defendant **JEREMY WAXMAN** was a resident of Miami-Dade County, Florida, and an owner and manager of Equilibrium, Silent Hill, West Bay, and Active Assist.

35.     Defendant **DEAN ZUSMER** was a resident of Miami-Dade County, Florida, and an owner and manager of Active Assist.

36.     Defendant **LAWRENCE ALEXANDER** was a resident of Miami-Dade County, Florida, and an owner of Silent Hill.

37.     Defendant **RONALD DAVIDOVIC** was a resident of Broward County, Florida, and Canada, and the owner of Lead Creations.

38.     Defendant **UMUT VARDAR** was a resident of Turkey, and a managing partner and registered agent of Lead Creations.

39.     Individual 1 was an owner and manager of West Bay.

40.     Balance Advisors Inc. ("Balance Advisors") was a company incorporated under the laws of Florida, with its principal place of business in Broward County, Florida, that maintained a bank account ending in 1899 at City National Bank (the "Balance Advisors Account"). **WAXMAN** was an owner of Balance Advisors.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around April 2014, and continuing through in or around April 2019, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JEREMY WAXMAN,**
**DEAN ZUSMER,**
**RONALD DAVIDOVIC, and**
**UMUT VARDAR,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, Individual 1, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the

custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things:   (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for the referral of beneficiaries and doctors' orders for braces and other documentation necessary to submit claims to Medicare and Medicare Advantage (collectively, "doctors' orders") through Equilibrium, Silent Hill, West Bay, and Active Assist; (b) paying and causing the payment of kickbacks and bribes to telemedicine companies in exchange for ordering and arranging for the ordering of braces for beneficiaries, without regard to the medical necessity of the prescribed braces or whether the braces were eligible for Medicare and Medicare Advantage reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage through Equilibrium, Silent Hill, West Bay, and Active Assist for braces that were medically unnecessary, ineligible for Medicare and Medicare Advantage reimbursement, and not provided as represented;

11

(d) concealing and causing the concealment of false and fraudulent claims; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.     **JEREMY WAXMAN** falsely certified to Medicare that he, as well as Equilibrium, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute, the requirement not to knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and the requirement not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

5.     In order to avoid scrutiny and ensure that he could constantly bill Medicare and Medicare Advantage, even if Equilibrium was audited or otherwise subject to regulatory scrutiny, **JEREMY WAXMAN** acquired beneficial ownership interests in other DME suppliers, including Silent Hill, West Bay, and Active Assist.

6.     **JEREMY WAXMAN** and other co-conspirators recruited and paid individuals, including **LAWRENCE ALEXANDER**, **DEAN ZUSMER**, and Individual 1, to establish the DME suppliers in their own or family members' names and to serve as nominee owners of DME suppliers, including Silent Hill, West Bay, and Active Assist, in order to conceal **WAXMAN**'s ownership role in the companies.

7.     **JEREMY WAXMAN** and **LAWRENCE ALEXANDER** caused CMS Form 855S to be submitted to Medicare on behalf of Silent Hill, falsely representing to Medicare that **LAWRENCE ALEXANDER**'s relative, Nominee Owner 1, was the sole owner and managing employee of Silent Hill.  In reality, **WAXMAN** and **ALEXANDER** maintained an ownership and

management interest in Silent Hill, which they concealed from Medicare.   The Medicare enrollment form which **WAXMAN** and **ALEXANDER** caused to be submitted also falsely certified that Nominee Owner 1, as well as Silent Hill, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute, the requirement not to knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and the requirement not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

8.     Individual 1, at **JEREMY WAXMAN**'s direction, submitted CMS Form 855S to Medicare on behalf of West Bay, in which Individual 1 falsely represented to Medicare that Individual 1 was the sole owner and managing employee of West Bay.  In reality, **WAXMAN** maintained an ownership and management interest in West Bay, which was concealed from Medicare.  The Medicare form which **WAXMAN** caused to be submitted also falsely certified to Medicare that Individual 1, as well as West Bay, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute, the requirement not to knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and the requirement not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

9.     **DEAN ZUSMER** submitted CMS Form 855S to Medicare on behalf of Active Assist, in which **ZUSMER** falsely represented to Medicare that **ZUSMER** was the sole owner and managing employee of Active Assist.  In reality, **JEREMEY WAXMAN** maintained an ownership and management interest in Active Assist, which was concealed from Medicare.  The Medicare form also falsely certified to Medicare that **ZUSMER**, as well as Active Assist, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-

Kickback Statute, the requirement not to knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and the requirement not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

10.     **JEREMY WAXMAN, DEAN ZUSMER**, Individual 1, and other co-conspirators paid and caused to be paid kickbacks and bribes to patient recruiters, including **RONALD DAVIDOVIC** and **UMUT VARDAR**, through Lead Creations, as well as SYL Marketing and others, in exchange for referring beneficiaries and doctors' orders for braces to Equilibrium, Silent Hill, West Bay, and Active Assist.

11.     **RONALD DAVIDOVIC, UMUT VARDAR**, and other co-conspirators paid kickbacks and bribes in exchange for the referral of beneficiaries and doctors' orders for braces. **DAVIDOVIC, VARDAR**, and other co-conspirators then negotiated kickback arrangements with DME suppliers, including, through **JEREMY WAXMAN**, Equilibrium, Silent Hill, West Bay, and Active Assist, to sell the beneficiaries and doctors' orders to the DME suppliers.

12.     **JEREMY WAXMAN, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR**, Individual 1, and other co-conspirators offered and paid, and caused to be paid, kickbacks and bribes to telemedicine companies, including Telemedicine Company 1, in exchange for doctors' orders for braces that were not medically necessary and not eligible for Medicare and Medicare Advantage reimbursement.  The orders were written by doctors contracted with the telemedicine companies, even though those doctors had no prior relationship with the beneficiaries, were not treating the beneficiaries, and did not conduct a proper telemedicine visit.

13.     **JEREMY WAXMAN, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR**, Individual 1, and other co-conspirators disguised the nature and source of the kickbacks and bribes by designating payments as "marketing" or "business process outsourcing"

services, entering into sham contracts, and generating and causing the generation of fraudulent invoices.

14.     **JEREMY WAXMAN, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR**, Individual 1, and other co-conspirators provided, and caused the provision of, DME to beneficiaries that was medically unnecessary, ineligible for reimbursement, did not fit, and that the beneficiaries did not request.

15.     To conceal the fraud scheme, **JEREMY WAXMAN** directed co-conspirators, including **RONALD DAVIDOVIC, UMUT VARDAR**, and Individual 1 to falsify paperwork associated with beneficiary referrals, including doctors' orders, proof of delivery forms, and shipping forms. **WAXMAN** and Individual 1 disguised this process by referring to it in coded terms. For example, **WAXMAN** and Individual 1 called the falsification of paperwork "arts and crafts," and **WAXMAN** instructed Individual 1 to falsify paperwork for a beneficiary by stating that the paperwork "needs borgata," with the term "borgata" being a code word indicating that the paperwork needed to be falsified.

16.     In total, from in or around April 2014 to in or around April 2019, **JEREMY WAXMAN, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR**, Individual 1, and other co-conspirators caused Equilibrium, Silent Hill, West Bay, and Active Assist to submit false and fraudulent claims to Medicare and Medicare Advantage, via interstate wire communication, in the approximate amount of at least $31,435,359, of which approximately $15,769,334 was paid.

17.     **JEREMY WAXMAN, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR**, Individual 1, and other co-conspirators used the fraud proceeds received from Medicare and Medicare Advantage to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-5**
**Health Care Fraud**
**(18 U.S.C. § 1347)**

1. Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around April 2014, and continuing through in or around April 2019, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JEREMY WAXMAN,**
**DEAN ZUSMER,**
**RONALD DAVIDOVIC, and**
**UMUT VARDAR,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit programs.

**Purpose of the Scheme and Artifice**

3. It was a purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for the referral of beneficiaries and doctors' orders for braces to Equilibrium, Silent Hill, West Bay, and Active Assist; (b) paying and causing the payment of kickbacks and bribes to telemedicine companies in exchange for ordering and arranging for the ordering of braces for beneficiaries, without regard to the medical necessity of the prescribed braces or whether the braces were eligible for Medicare and Medicare Advantage

16

reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage through Equilibrium, Silent Hill, West Bay, and Active Assist  for braces that were medically unnecessary, ineligible for Medicare and Medicare Advantage reimbursement, and not provided as represented; (d) concealing and causing the concealment of false and fraudulent claims; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### The Scheme and Artifice

4.      The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution or Attempted Execution
### of the Scheme and Artifice

5.      On or about the dates set forth as to each count below, in Miami-Dade and Broward Counties, in the Southern District of Florida and elsewhere, the defendants,

**JEREMY WAXMAN,
DEAN ZUSMER,
RONALD DAVIDOVIC, and
UMUT VARDAR,**

did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program in that the defendants so identified submitted and caused the submission of false and fraudulent claims, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary, eligible for Medicare reimbursement, and provided to beneficiaries as claimed:

| Count | Defendant(s) Charged | Beneficiary | Billing Entity | Approx. Date of Service | DME; Claim No. | Total Approx. Amount Billed |
|-------|----------------------|-------------|----------------|------------------------|----------------|------------------------------|
| 2 | **JEREMY WAXMAN** | V.K. | Equilibrium | 11/29/2017 | Ankle foot orthosis; Heel stabilizer; 117338800145000 | $510 |
| 3 | **JEREMY WAXMAN** and **DEAN ZUSMER** | B.W. | Active Assist | 7/11/2018 | Lumbar-sacral orthosis;  Shoulder, elbow, wrist, or hand orthosis; 118198802408000 | $2,150 |
| 4 | **JEREMY WAXMAN; RONALD DAVIDOVIC;** and **UMUT VARDAR** | A.N. | Silent Hill | 11/5/2018 | Lumbar-sacral orthosis; Shoulder, elbow, wrist, or hand orthosis; & Wrist/hand orthosis; 118312777707000 | $2,775 |
| 5 | **JEREMY WAXMAN** | J.W. | Equilibrium | 2/18/2019 | Wrist/hand orthosis; Elbow orthosis; 119052704127000 | $2,950 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 6
### Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.      Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of

this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around April 2014, and continuing through in or around April 2019, in

Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the

defendants,

**JEREMY WAXMAN,**
**LAWRENCE ALEXANDER,**
**DEAN ZUSMER,**
**RONALD DAVIDOVIC, and**
**UMUT VARDAR,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, Individual 1, and others known and unknown to the Grand Jury to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the HHS in its administration and oversight of Medicare and Medicare Advantage; and to commit offenses against the United States, that is:

a.     to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare and Medicare Advantage; and

b.     to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care benefit program, that is, Medicare and Medicare Advantage.

### Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things:   (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for the referral of beneficiaries and doctors' orders for braces to Equilibrium, Silent Hill, West Bay, and Active Assist; (b) paying and causing the

payment of kickbacks and bribes to telemedicine companies in exchange for ordering and arranging for the ordering of braces for beneficiaries, without regard to the medical necessity of the prescribed braces or whether the braces were eligible for Medicare and Medicare Advantage reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage through Equilibrium, Silent Hill, West Bay, and Active Assist for braces that were medically unnecessary, ineligible for Medicare and Medicare Advantage reimbursement, and not provided as represented; (d) concealing and causing the concealment of false and fraudulent claims; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.      **JEREMY WAXMAN** falsely certified to Medicare that he, as well as Equilibrium, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute.

5.      In order to avoid scrutiny and ensure that he could constantly bill Medicare and Medicare Advantage, even if Equilibrium was audited or otherwise subject to regulatory scrutiny, **JEREMY WAXMAN** acquired beneficial ownership interests in other DME suppliers, including Silent Hill, West Bay, and Active Assist.

6.      **JEREMY WAXMAN** and other co-conspirators recruited and paid individuals, including **LAWRENCE ALEXANDER**, **DEAN ZUSMER**, and Individual 1, to establish the DME suppliers in their own or family members' names and to serve as nominee owners of DME

suppliers, including Silent Hill, West Bay, and Active Assist, in order to conceal **WAXMAN**'s ownership role in the companies.

7.     **JEREMY WAXMAN** and **LAWRENCE ALEXANDER** caused CMS Form 855S to be submitted to Medicare on behalf of Silent Hill, falsely representing to Medicare that **ALEXANDER**'s relative, Nominee Owner 1, was the sole owner and managing employee of Silent Hill.  In reality, **WAXMAN** and **ALEXANDER** maintained an ownership and management interest in Silent Hill, which they concealed from Medicare.  The Medicare enrollment form which **WAXMAN** and **ALEXANDER** caused to be submitted also falsely certified that Nominee Owner 1, as well as Silent Hill, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute.

8.     Individual 1, at **JEREMY WAXMAN**'s direction, submitted CMS Form 855S to Medicare on behalf of West Bay, in which Individual 1 falsely represented to Medicare that Individual 1 was the sole owner and managing employee of West Bay.  In reality, **WAXMAN** maintained an ownership and management interest in West Bay, which was concealed from Medicare.  The Medicare form which **WAXMAN** caused to be submitted also falsely certified to Medicare that Individual 1, as well as West Bay, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute.

9.     **DEAN ZUSMER** submitted CMS Form 855S to Medicare on behalf of Active Assist, in which **ZUSMER** falsely represented to Medicare that **ZUSMER** was the sole owner and managing employee of Active Assist.  In reality, **JEREMEY WAXMAN** maintained a financial and management interest in Active Assist, which was concealed from Medicare.  The Medicare form also falsely certified to Medicare that **ZUSMER**, as well as Active Assist, would

21

comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute.

10.      **RONALD DAVIDOVIC, UMUT VARDAR**, and other co-conspirators paid kickbacks and bribes in exchange for the referral of beneficiaries and doctors' orders for braces. **DAVIDOVIC, VARDAR**, and other co-conspirators then negotiated kickback arrangements with DME suppliers, including, through **JEREMY WAXMAN**, Equilibrium, Silent Hill, West Bay, and Active Assist, and to sell the beneficiaries and doctors' orders to the DME suppliers.

11.      **JEREMY WAXMAN, LAWRENCE ALEXANDER, DEAN ZUSMER**, Individual 1, and other co-conspirators paid and caused to be paid kickbacks and bribes to patient recruiters, including **RONALD DAVIDOVIC** and **UMUT VARDAR**, through Lead Creations, as well as SYL Marketing, in exchange for referring beneficiaries and doctors' orders for braces to Equilibrium, Silent Hill, West Bay, and Active Assist.

12.      **JEREMY WAXMAN, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR**, Individual 1, and other co-conspirators offered and paid, and caused to be paid, illegal kickbacks and bribes to telemedicine companies, including Telemedicine Company 1, in exchange for doctors' orders for braces.

13.      As a result of the kickbacks and bribes that **JEREMY WAXMAN, LAWRENCE ALEXANDER, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR**, Individual 1 and other co-conspirators paid, caused to be paid, solicited, and received in exchange for referring beneficiaries to Equilibrium, Silent Hill, West Bay, and Active Assist, **WAXMAN, ALEXANDER, ZUSMER, DAVIDOVIC, VARDAR**, and Individual 1 denied beneficiaries the ability to choose which DME supplier, if any, they desired to fulfill their braces orders.

14.     **JEREMY WAXMAN, LAWRENCE ALEXANDER, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR,** Individual 1, and other co-conspirators disguised the nature and source of these kickbacks and bribes by designating payments as legitimate services, such as "marketing" or "business process outsourcing" services, entering into sham contracts, and generating and causing the generation of fraudulent invoices.

15.     **JEREMY WAXMAN, LAWRENCE ALEXANDER, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR,** and Individual 1 caused Equilibrium, Silent Hill, West Bay, and Active Assist to submit claims to Medicare and Medicare Advantage for braces purportedly provided to beneficiaries in at least the approximate amount of $31,435,359, of which approximately $15,769,334 was paid.

16.     **JEREMY WAXMAN, LAWRENCE ALEXANDER, DEAN ZUSMER, RONALD DAVIDOVIC, UMUT VARDAR,** Individual 1 and other co-conspirators used the proceeds received from Medicare and Medicare Advantage to benefit themselves and others, and to further the conspiracy.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others

1.     On or about April 1, 2014, **JEREMY WAXMAN** and **UMUT VARDAR** signed a Marketing Services Contract/Insertion Order, which falsely described that Lead Creations would provide to Equilibrium "Brace Leads" reflecting the following beneficiary information "First Name, Last Name, Address, City, State, Zip, and Phone."

2.      On or about April 16, 2015, **JEREMY WAXMAN** emailed **RONALD DAVIDOVIC** and **UMUT VARDAR** describing two beneficiaries for whom he could not submit claims to Medicare.  In the email, **WAXMAN** explained that he could not submit the claims because one beneficiary "returned the brace w[ith] a letter (see attached) saying he thought he was responding to an ad[] for free groceries" and the second beneficiary "was deceased."

3.      On or about November 3, 2015, **JEREMY WAXMAN** emailed **RONALD DAVIDOVIC, UMUT VARDAR**, and others, requesting a refund for a beneficiary for whom **WAXMAN** could not bill Medicare.  **WAXMAN** insisted that "I never got the [doctor's] order . . . Why should I pay for it ????"

4.      On or about August 15, 2016, **JEREMY WAXMAN** and **LAWRENCE ALEXANDER** caused a representative of Silent Hill to electronically submit CMS Form 855S, falsely representing to Medicare that **ALEXANDER**'s relative, Nominee Owner 1, was the sole owner and managing employee of Silent Hill. The CMS Form 855S also falsely certified that, among other things, Silent Hill would comply with the Federal Anti-Kickback Statute.

5.      On or about January 1, 2017, at the direction of **JEREMY WAXMAN**, **LAWRENCE ALEXANDER** signed a Sales and Marketing Agreement with a patient recruiter, which falsely described that the patient recruiter would provide "marketing and back office services" to Silent Hill, in exchange for $4,200 per week.

6.      On or about January 1, 2017, **LAWRENCE ALEXANDER** signed an Administrative Services Agreement with the patient recruiter, which falsely represented that the patient recruiter would provide "health care operations and business processes" for Silent Hill at the rate of $2,800 per week.  The agreement also falsely represented that the parties would comply with the Federal Anti-Kickback Statute.

7.     On or about May 3, 2018, **JEREMY WAXMAN** directed Individual 1 to sign a CMS Form 855S, falsely representing to Medicare that Individual 1 was the sole owner and managing employee of West Bay.   In reality, **WAXMAN** maintained an ownership and management interest in West Bay, which **WAXMAN** concealed from Medicare.  The CMS Form 855S also falsely certified that, among other things, West Bay would comply with the Federal Anti-Kickback Statute.

8.     On or about May 29, 2018, **JEREMY WAXMAN** emailed Lead Creations representatives, including **UMUT VARDAR**, copying **DEAN ZUSMER** and Individual 1, noting that Active Assist, "another new entity that I am involved with," "is ready to go live ASAP, preferably this week.  The initial campaign will be for 5k per week," meaning that Lead Creations would provide approximately $5,000 worth of beneficiary referrals and completed doctors' orders to Active Assist each week.

9.     On or about May 31, 2018, **DEAN ZUSMER** and **UMUT VARDAR** executed a Marketing Services Contract/Insertion Order, which falsely described that Lead Creations would provide to Active Assist "Brace Leads" reflecting the following beneficiary information "First Name, Last Name, Address, City, State, Zip, and Phone."

10.    On or about June 4, 2018, **JERMEY WAXMAN** signed check number 1295 from Equilibrium Account 2 in the amount of $5,000 addressed to Lead Creations.  The memo line for this check stated, "Active Assist."

11.    On or about June 5, 2018, **UMUT VARDAR** emailed **JEREMY WAXMAN** an invoice for Active Assist which falsely described Lead Creation's services as a flat "Marketing Fee" of $5,000.

12.     On or about June 5, 2018, **JEREMY WAXMAN** forwarded **UMUT VARDAR**'s email and the invoice to **DEAN ZUSMER**, noting that the invoice was "paid already."

13.     On or about June 19, 2018, at the direction of **JEREMY WAXMAN, DEAN ZUSMER** signed CMS Form 855S, falsely representing to Medicare that **ZUSMER** was the sole owner and managing employee of Active Assist.

14.     On or about June 21, 2018, **JEREMY WAXMAN** signed a Call Center Services and Outsourcing BPO Agreement with Telemedicine Company 1, which falsely described that Telemedicine Company 1 would provide "Business Process Outsourcing Services" to Equilibrium. In reality, **WAXMAN** paid and caused to be paid kickbacks and bribes to Telemedicine Company 1 in exchange for the referral of beneficiaries to Equilibrium, Silent Hill, West Bay, and Active Assist for DME, along with completed doctors' orders prescribing the DME.

15.     On or about August 9, 2018, **JEREMY WAXMAN** received an invoice from Telemedicine Company 1 for a week of service. The invoice falsely described that Telemedicine Company 1 was charging Equilibrium a total of $5,000, or 200 hours at $25 an hour, for "BPO Call Center Services as part of the Safe Harbor Agreement." The cover email transmitting the invoice indicated that the weekly minimum pre-payment amount was for 200 hours, "which is the fair market value equivalent of about 50 successful consults," *i.e.*, 50 doctors' orders for DME products. The invoices justified the purported "hourly rate" by equating the cost of the doctor's order to hours: "4 hours" (or $100) "is typically the effort required for one complete interaction."

16.     On or about August 20, 2018, **JEREMY WAXMAN** and Individual 1 received an updated reconciliation report for Silent Hill from a representative of Lead Creations, copying **UMUT VARDAR** and noting that Silent Hill's "balance" was $4,915.00.  The Lead Creations

representative further noted Silent Hill would receive "12 orders … today . . . ." **WAXMAN** confirmed in response that he "should be able to get to the bank for Silent Hill . . . ."

17.     On or about September 10, 2018, **JEREMY WAXMAN** and Individual 1 received an email from a representative of Lead Creations, who copied **UMUT VARDAR** and provided an invoice from Lead Creations to West Bay, which falsely represented that West Bay owed approximately $7,500 for a "Marketing Fee," when in fact what **WAXMAN** and Individual 1 were buying from Lead Creations was beneficiary referrals, including completed doctors' orders.

18.     On or about September 10, 2018, **UMUT VARDAR** emailed **JEREMY WAXMAN** a reconciliation report which tracked the patient referrals for particular types of braces that Lead Creations had supplied to date, the total amount owed for these referrals, and the total amount that West Bay had paid toward these referrals to date.

19.     On or about September 10, 2018, **JEREMY WAXMAN** signed check number 1132 from the West Bay Account in the amount of approximately $7,500, made payable to Lead Creations.

20.     On or about December 6, 2018, **JEREMY WAXMAN** received several invoices from Telemedicine Company 1 for multiple weeks of service.  The invoices falsely described that, each week, Telemedicine Company 1 charged Equilibrium a total of $5,000, or 200 hours at $25 an hour, for "BPO Call Center Services as part of the Safe Harbor Agreement."

21.     On or about December 7, 2018, **JEREMY WAXMAN** wired Telemedicine Company 1 approximately $5,000 from Equilibrium Account 1.

22.     On or about April 2, 2019, **DEAN ZUSMER** emailed **UMUT VARDAR**, among other representatives of Lead Creations, explaining that "I ran statistics for March.  Collections were WAY DOWN due to claim denials.  We're currently operating at a loss.  Bad data?  Sim

same? … We cannot sustain a campaign that doesn't perform. What's the solution to getting back on track?"

23.     On or about April 2, 2019, **UMUT VARDAR** emailed **DEAN ZUSMER**, copying **JEREMY WAXMAN**, explaining that Lead Creations typically did not charge Active Assist for beneficiary referrals that did not include a doctor's order that could be billed and instead offered a "credit" for such non-billable referrals, ensuring that a billable referral would follow: "You get credit for pretty much most of the denials."

24.     On or about April 5, 2019, **UMUT VARDAR** emailed **JEREMY WAXMAN** and **DEAN ZUSMER** "recon reports" for Silent Hill, West Bay, and Active Assist. The reports reflected the beneficiaries and doctors' orders that Lead Creations referred to Silent Hill, West Bay, and Active Assist, but for whom Silent Hill, West Bay, and Active Assist could not bill Medicare and Medicare Advantage, and for which Lead Creations gave "credit." The reports also reflected the total amount Silent Hill, West Bay, and Active Assist owed and paid for each type of doctors' order Lead Creations supplied.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 7-13
### Payment of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(2)(A))

1.     Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates enumerated below, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JEREMY WAXMAN and
DEAN ZUSMER,**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly

and indirectly, overtly and covertly, in cash and in kind, as set forth below, to a person, to induce

such person to refer an individual to a person for the furnishing and arranging for the furnishing

of any item and service for which payment may be made in whole and in part under a Federal

health care program, that is, Medicare and Medicare Advantage:

| Count | Defendant(s) Charged | Approx. Date of Kickback Payment | Approx. Amt. of Kickback Payment | Description of Kickback Payment |
|---|---|---|---|---|
| 7 | JEREMY WAXMAN | 9/21/2017 | $28,103 | Wire transfer from Silent Hill Account 1 to SYL Marketing. |
| 8 | JEREMY WAXMAN and DEAN ZUSMER | 6/4/2018 | $5,000 | Check no. 1295 drawn from Equilibrium Account 1, and made payable to Lead Creations, with a memo line stating, "Active Assist." |
| 9 | JEREMY WAXMAN and DEAN ZUSMER | 7/9/2018 | $7,500 | Check no. 1005 drawn from the Active Assist Account, and made payable to Lead Creations, with a memo line stating, "marketing/advertising." |
| 10 | JEREMY WAXMAN | 9/4/2018 | $7,500 | Check no. 1227 drawn from Silent Hill Account 1, and made payable to Lead Creations. |
| 11 | JEREMY WAXMAN | 9/10/2018 | $7,500 | Check no. 1132 drawn from the West Bay Account, and made payable to Lead Creations. |
| 12 | JEREMY WAXMAN and DEAN ZUSMER | 12/7/2018 | $5,000 | Wire transfer from Equilibrium Account 1 to Telemedicine Company 1. |
| 13 | JEREMY WAXMAN | 3/4/2019 | $7,500 | Check no. 1202 drawn from the West Bay Account, and made payable to Lead Creations. |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18,

United States Code, Section 2.

## COUNTS 14-18
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.      Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates enumerated below, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

### RONALD DAVIDOVIC and
### UMUT VARDAR,

did knowingly and willfully solicit and receive any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and Medicare Advantage:

| Count | Defendant(s) Charged | Approx. Date of Kickback Received | Approx. Amt. of Kickback Received | Description of Kickback Received |
|---|---|---|---|---|
| 14 | **RONALD DAVIDOVIC;** and **UMUT VARDAR** | 6/4/2018 | $5,000 | Check no. 1295 drawn from Equilibrium Account 1, made payable to Lead Creations, and deposited into the Lead Creations Account. |
| 15 | **RONALD DAVIDOVIC;** and **UMUT VARDAR** | 7/9/2018 | $7,500 | Check no. 1005 drawn from the Active Assist Account, made payable to Lead Creations, and deposited into the Lead Creations Account. |
| 16 | **RONALD DAVIDOVIC;** and **UMUT VARDAR** | 9/4/2018 | $7,500 | Check no. 1122 drawn from the West Bay Account, made payable to Lead Creations, and deposited into the Lead Creations Account. |
| 17 | **RONALD DAVIDOVIC;** and **UMUT VARDAR** | 9/11/2018 | $7,500 | Check no. 1132 drawn from the West Bay Account, made payable to Lead Creations, and deposited into the Lead Creations Account. |

| Count | Defendant(s) Charged | Approx. Date of Kickback Received | Approx. Amt. of Kickback Received | Description of Kickback Received |
|---|---|---|---|---|
| 18 | **RONALD DAVIDOVIC**; and **UMUT VARDAR** | 3/5/2019 | $7,500 | Check no. 1202 drawn from the West Bay Account, made payable to Lead Creations, and deposited into the Lead Creations Account. |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18,

United States Code, Section 2.

**COUNT 19**
**False Statements Relating to Health Care Matters**
**(18 U.S.C. § 1035)**

1.      Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of

this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about January 14, 2019, in Miami-Dade and Broward Counties, in the

Southern District of Florida, and elsewhere, the defendants,

**JEREMY WAXMAN and**
**LAWRENCE ALEXANDER,**

in a matter involving a health care benefit program, that is, Medicare, did knowingly and willfully

make and use a materially false, fictious, and fraudulent writing and document, knowing the same

to contain a materially false, fictious, and fraudulent statement and entry, in connection with the

delivery and payment for health care items and services, that is, signing and submitting to Medicare

a CMS Form 855S certifying that Nominee Owner 1 was the sole owner and managing employee

of Silent Hill, when, in truth and in fact, as defendants then and there well knew, Nominee Owner

1 was not the sole owner and managing employee of Silent Hill because **WAXMAN** and

**ALEXANDER** were also owners and managing employees of Silent Hill.

In violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## COUNT 20
### False Statements Relating to Health Care Matters
### (18 U.S.C. § 1035)

1.       Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.       On or about May 3, 2018, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**JEREMY WAXMAN,**

in a matter involving a health care benefit program, that is, Medicare, did knowingly and willfully make and use a materially false, fictious, and fraudulent writing and document, knowing the same to contain a materially false, fictious, and fraudulent statement and entry, in connection with the delivery and payment for health care items and services, that is, signing and submitting to Medicare a CMS Form 855S certifying that Individual 1 was the sole owner and managing employee of West Bay, when, in truth and in fact, as **WAXMAN** then and there well knew, Individual 1 was not the sole owner and managing employee of West Bay because **WAXMAN** was also an owner and managing employee of West Bay.

In violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## COUNT 21
### False Statements Relating to Health Care Matters
### (18 U.S.C. § 1035)

1.       Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.       On or about June 19, 2018, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JEREMY WAXMAN and
DEAN ZUSMER,**

in a matter involving a health care benefit program, that is, Medicare, did knowingly and willfully make and use a materially false, fictious, and fraudulent writing and document, knowing the same to contain a materially false, fictious, and fraudulent statement and entry, in connection with the delivery and payment for health care items and services, that is, signing and submitting to Medicare a CMS Form 855S certifying that **ZUSMER** was the sole owner and managing employee of Active Assist, when, in truth and in fact, as defendants then and there well knew, **ZUSMER** was not the sole owner and managing employee of Active Assist because **WAXMAN** was also an owner and managing employee of Active Assist.

In violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

### COUNTS 22-23
### Money Laundering
### (18 U.S.C. § 1957(a))

1.      Paragraphs 1 through 20 and 27 through 40 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth as to each count below, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

### JEREMY WAXMAN,

did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and such property having been derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity:

| Count | Approx. Date of Transaction | Approx. Amount of Transaction | Description of Monetary Transaction |
|-------|------------------------------|-------------------------------|--------------------------------------|
| **22** | 1/12/2017 | $200,000 | The deposit of check no. 4524 drawn from Equilibrium Account 2 and deposited into TD Ameritrade account ending in 0112 held in the name of **JEREMY WAXMAN**. |
| **23** | 3/1/2018 | $500,000 | The deposit of check no. 1217 drawn from Equilibrium Account 1 deposited into TD Ameritrade account ending in 0112 held in the name of **JEREMY WAXMAN**. |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and payment of kickbacks in connection with a Federal health care program, in violation of Title 42, United States Code, 1320a-7b.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

### COUNTS 24-25
### Wire Fraud
### (18 U.S.C. § 1343)

1.    The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2.    From in or around April, 2020, and continuing through in or around June 2020, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JEREMY WAXMAN,**

did knowingly, and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did

34

knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by: (a) submitting and causing the submission, via interstate wire communication, of false and fraudulent applications for loans and grants made available through the SBA to provide relief for the economic effects caused by the COVID-19 pandemic, including EIDLs; (b) diverting fraud proceeds for their personal use, the use and benefit of others, and to further the fraud; and (c) concealing and causing the concealment of the false and fraudulent applications.

### The Scheme and Artifice

4.      On or about April 3, 2020, **JEREMY WAXMAN** submitted, and caused the submission of, an EIDL application in the name of Equilibrium seeking an EIDL (the "Equilibrium EIDL Application"). In the Equilibrium EIDL Application, **WAXMAN** falsely represented, among other things, that Equilibrium was "not engaged in any illegal activity," that Equilibrium's gross revenues for the twelve months prior to the date of the disaster were $817,633, and that Equilibrium's cost of goods sold for the twelve months prior to the date of the disaster were $634,523.

5.      On or about April 3, 2020, **JEREMY WAXMAN** submitted, and caused the submission of, an EIDL application in the name of Balance Advisors seeking an EIDL (the "Balance Advisors EIDL Application"). In the Balance Advisors EIDL Application, **WAXMAN** falsely represented, among other things, that Balance Advisors was "not engaged in any illegal

activity," that Balance Advisor's gross revenues for the twelve months prior to the date of the disaster were $662,235, and that Balance Advisor's cost of goods sold for the twelve months prior to the date of the disaster were $168,625.

6.      As a result of the false and fraudulent Equilibrium EIDL Application and the false and fraudulent Balance Advisors EIDL Application, SBA approved the EIDLs.

7.      On or about June 10, 2020, **JEREMY WAXMAN** submitted, and caused the submission of, an EIDL Loan Authorization and Agreement (the "Equilibrium EIDL Loan Agreement"), seeking an EIDL for Equilibrium in the approximate amount of $89,600.  In the Equilibrium EIDL Loan Agreement, **WAXMAN** falsely certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

8.      On or about June 10, 2020, **JEREMY WAXMAN** submitted, and caused the submission of, an EIDL Loan Authorization and Agreement (the "Balance Advisors EIDL Loan Agreement"), seeking an EIDL for Balance Advisors in the approximate amount of $150,000.  In the Balance Advisors EIDL Loan Agreement, **WAXMAN** falsely certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

9.      In reliance on the false representations made in the Equilibrium EIDL Application, the SBA deposited $2,000 in the form of an EIDL advance into Equilibrium Account 1.  In reliance on false and fraudulent representations made in the Equilibrium EIDL Application and Equilibrium EIDL Loan Agreement, the SBA then deposited approximately $89,500 into Equilibrium Account 1.

10.     In reliance on the false representations made in the Balance Advisors EIDL Application, the SBA deposited $1,000 in the form of an EIDL advance into the Balance Advisors Account. In reliance on false and fraudulent representations made in the Balance Advisors EIDL Application and Balance Advisors EIDL Loan Agreement, the SBA then deposited approximately $149,900 into the Balance Advisors Account.

### Use of Wires

11.     On or about the dates specified as to each count below, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, **JEREMY WAXMAN**, for the purpose of executing and in furtherance of the aforementioned scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, as described below:

| Count | Approx. Date of Submission | Description of Wire |
|-------|---------------------------|---------------------|
| **24** | 6/10/2020 | Electronic transmission from **JEREMY WAXMAN**, from within Florida, to SBA, through servers outside of Florida, of the EIDL Loan Agreement for Equilibrium. |
| **25** | 6/10/2020 | Electronic transmission from **JEREMY WAXMAN**, from within Florida, to SBA, through servers outside of Florida, of the EIDL Loan Agreement for Balance Advisors. |

In violation of Title 18, United States Code, Sections 1343 and 2.

### FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(1), (a)(2)(A), (a)(7))

1.     The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for alleging forfeiture to the United States of certain property in which the defendants, **JEREMY WAXMAN, LAWRENCE ALEXANDER, DEAN ZUSMER, RONALD DAVIDOVIC,** and **UMUT VARDAR,** have an interest.

37

2.      Upon conviction of a violation of, or a criminal conspiracy to violate, a "Federal health care offense," as defined in Title 18, United States Code, Section 24(a), as alleged in Counts 1-21 of this Indictment, the defendant so convicted shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to such violation.

3.      Upon conviction of a violation of Title 18, United States Code, Section 1957(a), as alleged in Counts 22-23 of this Indictment, defendant **JEREMY WAXMAN** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such violation, and any property traceable to such property.

4.      Upon conviction of a violation of Title 18, United States Code, Section 1343, as alleged in Counts 24-25 of this Indictment, defendant **JEREMY WAXMAN** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting or derived from, proceeds obtained directly or indirectly, as the result of such violation.

5.      The property, which is subject to criminal forfeiture includes, but is not limited to, the following:

(a)      All principal, deposits, interest, dividends, and any other amounts credited to account number 488613758 held at TD Ameritrade, in the name of **JEREMY WAXMAN** for the benefit of Equilibrium Medical Supply Inc. 401(k) Plan; and

(b)      All principal, deposits, interest, dividends, and any other amounts credited to account number 777100112 held at TD Ameritrade, in the name of **JEREMY WAXMAN**.

All pursuant to Title 18, United States Code, Sections 982(a)(1), 982(a)(2)(A), and 982(a)(7), and the procedures outlined at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____
FOREPERSON

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JAMIE DE BOER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

JEREMY WAXMAN, et al.

_____ Defendants/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY***
**Superseding Case Information:**

**Court Division:** (Select One)

☐ Miami   ☐ Key West   ☑ FTL
☐ WPB     ☐ FTP

New defendant(s)   ☐ Yes   ☐ No
Number of new defendants   _____
Total number of counts   _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) **No** _____
   List language and/or dialect _____

4. This case will take __15__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   | | (Check only one) | | | (Check only one) | |
   |---|---|---|---|---|---|
   | I | 0 to 5 days | ☐ | Petty | | ☐ |
   | II | 6 to 10 days | ☐ | Minor | | ☐ |
   | III | 11 to 20 days | ☑ | Misdemeanor | | ☐ |
   | IV | 21 to 60 days | ☐ | Felony | | ☑ |
   | V | 61 days and over | ☐ | | | |

6. Has this case previously been filed in this District Court? (Yes or No) **No** _____

   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No** _____
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No** _____

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No** _____

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? (Yes or No) **No** _____

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No** _____

_____
JAMIE DE BOER
DOJ Trial Attorney
Court ID No.   A5502601

*Penalty Sheet(s) attached

REV 3/19/21

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **JEREMY WAXMAN**

**Case No:** _____

**Count(s) #:** 1_____

 Conspiracy to Commit Health Care Fraud and Wire Fraud

 Title 8, United States Code, Section 1349

**\*Max.Penalty:**   20 Years' Imprisonment


**Count(s)#:** 2-5_____

 Health Care Fraud

 Title 18, United States Code, Section 1347

**\*Max.Penalty:**   10 Years' Imprisonment As To Each Count


**Count(s)#:**  6_____

 Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks

 Title 18, United States Code, Section 371

**\*Max.Penalty:**   5 Years' Imprisonment


**Count(s)#:** 7-13_____

 Payment of Kickbacks in Connection with a Federal Health Care Program

 Title 42, United States Code, Section 1320a-7b(b)(2)(A)

**\*Max.Penalty:**   10 Years' Imprisonment As To Each Count

CONTINUED PENALTY SHEET
page 2 of 2

**Defendant's Name:** **JEREMY WAXMAN**

**Case No:**

**Count(s) #:** 19-21

 False Statements Relating to Health Care Matters

 Title 8, United States Code, Section 1035

**\*Max.Penalty:**  5 Years' Imprisonment As To Each Count


**Count(s)#:** 22-23

 Money Laundering

 Title 18, United States Code, Section 1957(a)

**\*Max.Penalty:**  5 Years' Imprisonment As To Each Count


**Count(s)#:** 24-25

 Wire Fraud

 Title 18, United States Code, Section 1343

**\*Max.Penalty:**  20 Years' Imprisonment As To Each Count


**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**          **LAWRENCE ALEXANDER**

**Case No:**

Count #:   6

   Title 18, United States Code, Section 371

   Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks

*Max Penalty:      Five (5) years' imprisonment

 Count #:    19

   Title 18, United States Code, Section 1035

   False Statements Relating to Heath Care Matters

**\*Max Penalty**:    Five (5) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** DEAN ZUSMER

**Case No:** _____

**Count(s) #:** 1_____

 Conspiracy to Commit Health Care Fraud and Wire Fraud

 Title 8, United States Code, Section 1349

 **\*Max.Penalty:** 20 Years' Imprisonment


**Count(s)#:** 3_____

 Health Care Fraud

 Title 18, United States Code, Section 1347

 **\*Max.Penalty:** 10 Years' Imprisonment


**Count(s)#:** 6_____

 Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks

 Title 18, United States Code, Section 371

 **\*Max.Penalty:** 5 Years' Imprisonment


**Count(s)#:** 8-9, 12_

 Payment of Kickbacks in Connection with a Federal Health Care Program

 Title 42, United States Code, Section 1320a-7b(b)(2)(A)

 **\*Max.Penalty:** 10 Years' Imprisonment As To Each Count


**page 1 of 2**

CONTINUED PENALTY SHEET
page 2 of 2


**Defendant's Name:** **DEAN ZUSMER** _____

**Case No:** _____

**Count(s) #:** 21_____

 False Statements Relating to Health Care Matters _____

 Title 8, United States Code, Section 1035 _____

**\*Max.Penalty:**   5 Years' Imprisonment As To Each Count _____


**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** RONALD DAVIDOVIC

**Case No:**

**Count(s) #:** 1

 Conspiracy to Commit Health Care Fraud and Wire Fraud

 Title 8, United States Code, Section 1349

**\*Max.Penalty:** 20 Years' Imprisonment

**Count(s)#:** 4

 Health Care Fraud

 Title 18, United States Code, Section 1347

**\*Max.Penalty:** 10 Years' Imprisonment

**Count(s)#:** 6

 Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks

 Title 18, United States Code, Section 371

**\*Max.Penalty:** 5 Years' Imprisonment

**Count(s)#:** 14-18

 Receipt of Kickbacks in Connection with a Federal Health Care Program

 Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max.Penalty:** 10 Years' Imprisonment As To Each Count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** UMUT VARDAR

**Case No:** _____

**Count(s) #:** 1

 Conspiracy to Commit Health Care Fraud and Wire Fraud

 Title 8, United States Code, Section 1349

**\*Max.Penalty:**   20 Years' Imprisonment


**Count(s)#:** 4

 Health Care Fraud

 Title 18, United States Code, Section 1347

**\*Max.Penalty:**   10 Years' Imprisonment


**Count(s)#:**  6

 Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks

 Title 18, United States Code, Section 371

**\*Max.Penalty:**   5 Years' Imprisonment


**Count(s)#:** 14-18

 Receipt of Kickbacks in Connection with a Federal Health Care Program

 Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max.Penalty:**   10 Years' Imprisonment As To Each Count


**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**